## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   COTTONWOOD CORNERS PHASE V, LLC,
      a New Mexico limited liability company,       No. 11-11-12663 JA

      Debtor.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on confirmation of the Amended Plan of Reorganization Dated October 7, 2011 (Docket No. 71), as modified by the Debtor's First Modification to Amended Plan of Reorganization Dated October 7, 2011 (Docket No. 89), and as modified by Debtor's Second Modification to Amended Plan of Reorganization Dated October 7, 2011 (Docket No. 99) (the "Plan") filed by Cottonwood Corners Phase V, LLC ("Cottonwood").  Jefferson-Pilot Investments, Inc. ("JPI"), Cottonwood's largest creditor, opposes confirmation.  The Court conducted a two-day evidentiary hearing on confirmation and took the matter under advisement. After consideration of the evidence presented at the final hearing, and being otherwise sufficiently informed, the Court finds that the Plan, in its present form, is unconfirmable.  In reaching this conclusion, the Court will address the arguments of the parties presented at the final hearing and in the simultaneous briefs submitted by counsel post-hearing. [1]

### <u>BACKGROUND, PROCEDURAL HISTORY, AND UNDERLYING FACTS</u>

Cottonwood is a New Mexico limited liability company owned 83% by RSF Land & Cattle Company, LLC ("RSF") and 17% by SED CAP.  Its main asset is a pad within a larger shopping center in Albuquerque, New Mexico.  On February 1, 2004, RSF entered into a ground lease with Circuit City Stores West Coast, Inc. ("Circuit City") under an arrangement

---

[1]  The Court held the confirmation hearing on January 25 and 26, 2012.  The parties filed post-hearing briefs on February 7, 2012.

in which Circuit City would construct a building and other improvements on the land owned by Cottonwood within the Cottonwood Corners Shopping Center. Circuit City would operate a retail electronics store from that site. The lease had an initial term of 15 years, and five consecutive five-year renewal options. The lease contained a Subordination, Non-disturbance and Attornment Agreement ("SNDA"). RSF subsequently assigned its interest in the lease to Cottonwood.

To prevent Circuit City from exercising an option to buy out the ground lease, Cottonwood exercised an option to purchase the building and improvements from Circuit City, and to lease the land and building to Circuit City. On January 30, 2007, Cottonwood borrowed $3.5 million from Jefferson Pilot-Life Insurance Company ("JPI-Insurance") to fund the option price and to create a reserve. On January 26, 2007, JPI-Insurance and Circuit City entered into an SNDA. At the time the loan was made, Circuit City's parent, a publicly traded corporation, was implementing a turnaround plan. The loan proceeds included $500,000 for a reserve to service debt and to have funds needed to re-let the premises, including for leasing commissions and tenant improvements, in the event Circuit City defaulted under the lease. The loan was evidenced by a promissory note made by Cottonwood in favor of JPI-Insurance (the "Note") and secured by a Mortgage and Security Agreement (the "Mortgage") (together, the Note and Mortgage and other loan documents are called the "Loan Documents") granting liens against the real property and improvements and certain personal property. JPI-Insurance's sole recourse under the Loan Documents in the event of default was against Cottonwood and its collateral. The loan was nonrecourse to the members of Cottonwood.

The Loan Documents do not contain a requirement on the part of Cottonwood to maintain any reserves, nor did Cottonwood grant JPI-Insurance a security interest in the $500,000 of loan proceeds held by Cottonwood as a reserve. The Note required equal monthly payments of principal and interest in the amount of $24,793.00 such that payment obligations under the Note would fully amortize over a period of twenty (20) years. The Note provides that the unpaid principal balance under the Note bears a fixed rate of interest at the rate 5.86% per annum; provided that, upon default, the interest rate increases by four (4) percentage points.

The Note prohibits prepayment prior to January 30, 2011, and permits prepayment thereafter subject to a prepayment premium. The Note provides that the prepayment premium is calculated as follows:

> The Prepayment Premium shall be the greater of (a) one percent (1%) of the outstanding principal balance of his Note on the Prepayment rate, or (b) the result of (i) the sum of the present values (determined over the Remaining Term using periodic monthly intervals and a discount rate equal to the Treasury Yield divided by twelve (12) of all the then remaining unpaid Payments due from the Prepayment Date through the maturity ate minus (ii) the outstanding principal balance of this Note as of the prepayment Date.

The Note further provides that if, after an acceleration of the payments due under the Note but prior to a foreclosure sale or other sale of the property, a tender is made of the amount required to satisfy the entire indebtedness owed under the Note, such tender shall be conclusively deemed a deliberate evasion of the prepayment premium and shall be treated as a prepayment triggering Cottonwood's obligation to pay the prepayment premium. *See* ¶ 10.2 of the Note.

Circuit City filed a bankruptcy case, and in March of 2009 stopped paying rent under the lease. At that time, the real estate market was depressed. Cottonwood diligently searched

for a tenant that would pay a rental rate necessary to service Cottonwood's debt, but to no avail. Cottonwood had substantially increased the $500,000 reserve during the period that Circuit City paid rent by not distributing accumulating funds to members. After Circuit City stopped paying rent, Cottonwood began using the reserve to service its debt to JPI-Insurance. In April 2010, when the balance in the reserve was approximately $530,000, and after Cottonwood's efforts to renegotiate loan terms with JPI-Insurance were unsuccessful, Cottonwood stopped making debt service to JPI-Insurance. Shortly thereafter, JPI-Insurance assigned its interests under the Loan Documents to JPI.

In April 2010, JPI sent Cottonwood a notice of default under the loan documents. The members of Cottonwood decided not to use funds in the reserve to cure the default or to make further debt service. Instead, in approximately May of 2010, Cottonwood distributed the amount remaining in the reserve to its two members in proportion to their membership interests to preserve the reserve in order to fund costs associating with re-letting the premises. The members deposited the distributed funds in segregated bank accounts. In June 2010, JPI exercised its option to accelerate the remaining balance due under the Note.

Subsequently, RSF used a portion of the distributed funds to pay operating expenses and taxes incurred by Cottonwood, and contributed a portion of the funds back to Cottonwood to build a demising wall in connection with a temporary lease. Currently, there remains approximately $325,000 in the RSF segregated account. All of the $85,000 distributed to SED CAP remains in its segregated account.

After Cottonwood had made substantial efforts over an extended period to re-let the property, it found two tenants for the property: Baillios, LLC ("Baillios") and Panera LLC ("Panera"). Cottonwood, as landlord, and Baillios, as tenant, entered into a lease for

approximately 29,234 square feet of the 34,000 square foot building. Cottonwood has negotiated a lease with Panera for $4,000 square feet of the building. Cottonwood's lease with Baillio's is for an initial term of ten years, with three 5-year renewal options. The lease with Panera provides for an initial term of ten years, with three 5-year extension options. However, the terms of the leases have not commenced.

On July 16, 2010, JPI filed a foreclosure action against Cottonwood in the Second Judicial District of the State of New Mexico, thereby commencing Case No. CV 2010-08639. Cottonwood filed a counterclaim, seeking injunctive relief to compel JPI to execute SNDAs in favor of Baillios and Panera. The State Court conducted an evidentiary hearing on January 11, 2011 and May 17, 2011. Cottonwood commenced its chapter 11 case on June 8, 2011. In August of 2011, the State Court denied Cottonwood's requested injunctive relief, finding, in part, that Cottonwood had not established any bad faith, misrepresentation, or inequitable conduct on the part of JPI, and finding further that Cottonwood's distribution of the funds in the reserve to its members instead of using those funds to cure the default to JPI was in bad faith.

<u>JPI'S CLAIM</u>

Cottonwood's has stipulated that for purposes of confirmation, JPI's claim should be estimated in the amount of at least $ 3,890,116.30, consisting of:

| Unpaid principal | $3,188,515.88 |
|---|---|
| Interest at the non-default rate 03/01/10 to 06/02/10 | $ 47,749.84 |
| Interest at the default rate 06/03/10 to 06/07/11 | $ 318,754.00 |
| Late fees | $1,983.44.00 |
| Post-petition interest at the non-default rate through 01/25/12 | $ 120,412.64 |
| Advances for real property taxes | $112,700.90 |

-5-

| | |
|---|---|
| and insurance | |
| Attorneys fees | $ 100,000.00 |
| TOTAL | $ 3,890,116.30 |

See Debtor's Reply, filed January 25, 2012 (Docket No. 105).

JPI claims that Cottonwood owes it $4,760,819 as of January 31, 2012, which includes $4,156,879.34 owed as of the Petition Date. The principal differences between the amount JPI claims and the amount of Cottonwood's estimate of the claim consists of the following amounts:

| | |
|---|---|
| Acceleration fee | $ 523,699.92 |
| Post-petition interest at default rate less at non-default rate | $ 82,547 |
| Interest on attorneys fees and advances | $ 7,167.00 |
| Post-petition attorneys fees | $ 205,327.15[2] |

### COTTONWOOD'S REORGANIZATION PLAN

Cottonwood's Plan contains two alternatives for treating JPI's claim, which JPI may choose at its option. Under Option 1, JPI's loan would be de-accelerated. The original payment terms and non-default interest rate of 5.86% per annum would be reinstated as to the portion of the debt owed not included in the "arrearage," as defined in the Plan. Cottonwood would cure the arrearage over a period of 5.75 years in equal quarterly payments. The arrearage would consist of all pre-petition regularly scheduled payments that were not paid, all pre- and post-petition attorneys' fees allowed as part of JPI's claim, pre-petition costs allowed under the applicable Loan Documents, and post-petition costs incurred before the Plan effective date reasonably necessary to preserve and protect JPI's collateral. The portion

---

[2] JPI claims attorneys fees incurred through January 31, 2012 in the amount of $305,327.15, consisting of $61,524.15 incurred pre-petition and $243,803 incurred post-petition. Cottonwood estimated total attorneys' fees for JPI includible in its claim of $100,000. The difference between $305,327.15 and $100,000 is $205,327.15.

of the arrearage representing the unpaid portion of the principal balance of the loan that would

have been paid pre-petition, had Cottonwood not defaulted under the loan, would bear interest

at the rate of 4% percent per annum (the difference between the default and non-default rates

of interest under the Loan Documents) between June 3, 2010 and June 8, 2011 (the petition

date).  All of the arrearage would bear interest between the effective date of the Plan and

March 31, 2012 at the non-default rate of interest.  The entire arrearage, plus any unpaid post-

petition interest thereon, would bear interest after March 31, 2012 at the 5.86% per annum

(the non-default rate of interest specified in the Loan Documents).

Under Option 2, Cottonwood would pay the entire balance of the indebtedness owed

by Cottonwood to JPI two years after the effective date of the Plan.  A member of RSF, which

is itself a member of Cottonwood, would deposit $1 million in cash or negotiable instruments

to be used as additional collateral or capital to facilitate a refinancing to effectuate the payoff

of JPI.  The Plan does not identify the member of RSF in question, or where or when the

deposit would be made.  There is no evidence of any legally binding obligation to make the

deposit.  If JPI elected Option 2, it would have consented to disallowance of its claims for an

acceleration fee, post-petition interest at the higher default rate, interest on attorneys' fees and

advances would be disallowed, and no payments would be made on the prepetition arrearage

until the loan was paid off on the two year anniversary date of the Plan's effective date.

Cottonwood would put a deed to the property in lieu of foreclosure in escrow.  If Cottonwood

failed to pay as agreed, the deed would be delivered to JPI and recorded.  Recordation of the

deed would constitute payment in full to JPI.

Under both options, confirmation of the Plan would bind Cottonwood to the terms of

an SNDA contained in the Plan.  Those terms are substantially similar to the terms of the

SNDA between JPI and Circuit City, although the Plan contemplates new proposed tenants that are quite different from Circuit City. Neither option contains any limitations on distributions to Cottonwood's members, except as to guaranteed disbursements to David Smoak for compensation in excess of $3,000 per month until the arrears to JPI are paid in full.

The Plan classified unsecured non-priority claims in Class 3. The Class 3 claims total $46,372.80. Cottonwood's real estate attorney holds the largest claim in Class 3, with a claim in the amount of $37,122.96. The remaining $9,249.84 of claims in Class 3 are held by fifteen creditors, and mostly consist of charges for services that were incurred but not yet due pre-petition. These are the types of expenses that Cottonwood's member, RSF, regularly paid pre-petition. Cottonwood's manager is also the manager of RSF, and made the decision on behalf of RSF not to pay the Class 3 claims post-petition from RSF's funds.

## CASH FLOW PROJECTIONS AND FACTS RELEVANT TO FEASABILITY

Cottonwood's cash flow projections admitted in evidence in support of plan confirmation are based on consummation of the lease to Baillios and the lease to Panera. The projections assume an interest rate of 5.86% per annum on JPI's claim, and assume partial disallowance of JPI's claim for the following components of its claim: 1) a $523,700 "Acceleration Fee", 2) post-petition interest accrued at the difference between the default rate and non-default rates of interest; and 3) interest on reimbursable expenses and attorneys' fees. Cottonwood's projections assume total post-petition reimbursable legal fees incurred by JPI of $75,000. JPI's actual post-petition legal fees well exceed $250,000. Cottonwood's projections further assume use of all but about $30,000 of the $410,000 remaining in the reserve held by Cottonwood's members to pay leasing commissions, tenant improvement costs, and other costs associated with the Baillios and Panera leases. Projected revenue

-8-

includes combined rent under the leases to Baillios and Panera, exclusive of expense reimbursements, in the amount of $275,636 in 2012, $512,258 in 2013, and increases each year thereafter.

The projections forecast cash flow shortfalls in 2012, 2013, and 2014 of $47,737.00, $46,028.00, and $3,284.00, respectively. Taking into account cash on hand at the beginning of 2012, the projections forecast an ending cash balance on December 31, 2014 in the amount of $26,479, net of capital contributions during those years totaling $100,000. The projections forecast operating profits in 2015 and 2016 of $11,146 and $24,045, respectively. The projections forecast a more significant operating profit in the amount of $78,247 in 2017, increasing to $199,284 in 2018.

Cottonwood's manager testified that members of Cottonwood's members have purchased a $75,000 certificate of deposit at Wells Fargo Bank, and will use the certificate of deposit together with either a) a $25,000 contribution by SED CAP; or b) the approximate $30,000 reserve expected to remain after payment of leasing costs, to acquire a $100,000 letter of credit that Cottonwood could draw upon to cover operating shortfalls, as needed. As of the date of the confirmation hearing, the letter of credit had not been issued. Further none of Cottonwood's members have legally committed to contribute $100,000 to Cottonwood as necessary to cover operating shortfalls, nor have they legally committed to use the approximate $425,000 remaining in the segregated accounts.

Cottonwood relies on rental income to service debt. Currently the only rental income Cottonwood receives is rental income under a Temporary Lease Agreement between Cottonwood and Baillios. The terms of the long term leases by Cottonwood to Baillios and

Panera have not commenced because Cottonwood has not obtained confirmation of a chapter 11 plan that includes the equivalent of SNDAs in favor of Baillios and Panera.

## THE SIGNIFICANCE OF AN SNDA

It is usual and customary that tenants of commercial space require an SNDA as a condition to entering into a long term lease, particularly if the tenant is sophisticated, intends to make substantial tenant improvements, or operates a retail location where loss of the location could be detrimental. The absence of SNDAs will substantially impair Cottonwood's ability to lease the premises. SNDAs generally contain both standard provisions and negotiated terms.

A representative of JPI testified that the SNDA terms that JPI found acceptable for Circuit City as a tenant were not acceptable to JPI for the Baillios and Panera leases for several reasons. First, JPI perceives that Circuit City was a more creditworthy tenant than Baillios or Panera. Second, the lease premises were originally built for a single user, and carving the space into two units would make it harder to re-let. Third, at the time that the SNDA was executed in favor of Circuit City in connection with the Circuit City lease, Cottonwood had a $500,000 cash reserve.

## INTEREST RATES

Both Cottonwood and JPI presented expert testimony on market interest rates.

<u>JPI's Expert Testimony on the appropriate rate of interest:</u>

JPI's expert on interest rates, R. Thomas Gracey, opined that that the market rate of interest for the type of loan made by JPI to Cottonwood, on the terms contained in the Plan (which includes an interest rate fixed for 15 years), is 8.5% per annum. Mr. Gracey computed a 2013 loan to value ("LTV") ratio of 92.85%. To determine the 2013 LTV ratio, Mr. Gracey

divided an assumed debt in the amount of $3,946,184 of by his $4,250,000 estimate of the value of the property pledged to JPI. Mr. Gracey determined value by dividing net operating income ("NOI") of $414,893 by a capitulation rate, also known as a cap rate, of 9.5%. To compute NOI of $414,893, Mr. Gracey used 2013 as a stabilized year for the property.[3] To determine the appropriate cap rate, Mr. Gracey took into account his assessment of tenant risk,[4] factored in his observations that a) the size of the building on the property is an awkward size - too big for certain types of tenants, and too small for others; and b) the depth and shape of the building makes it even more difficult to lease if it is divided for use by multiple tenants.

Mr. Gracey computed a debt coverage ratio ("DCR") of .72 in 2013 and .85 in 2014, dividing net operating income by total annual debt service under Cottonwood's proposed Plan (including $188,572 per year to cure pre-petition arrearages over a period of 5.75 years).

Mr. Gracey opined that the market interest rate fixed for 15 years for the type of loan in question is 5.5% per annum if it were a high quality loan (the 10-year treasury rate plus 3.5 points), and that a high quality loan would have a LTV ratio of not to exceed 70% and a DCR of 1.4 or higher. He then adjusted the interest rate charged for high quality loans by 1.5% based on his assessment of the LTV ratio and DCR under Cottonwood's proposed plan treatment of JPI's claim and 1.5% based on the character of the borrower.

Mr. Gracey's expertise relating to interest rates is primarily focused on the rates charged for healthy loans. He testified that a loan to Cottonwood would be classified as a subprime loan. Mr. Gracey's personal experience is limited to high quality loans.

---

[3] Mr. Gracey's calculation of NOI was based on a 4% market rate for a management fee instead of the 3% management fee Cottonwood pays to an affiliate for management of the property. Mr. Gracey assumed $45,810 per year of common area expenses based on information provided by JPI without reviewing historical information. He included a 10% allowance for vacancy loss taking into account tenant risk.

[4] Mr. Gracey assessed Baillios as a local B grade tenant based on its net worth, track record and product mix.

Cottonwood's Expert Testimony on the Appropriate Interest Rate:

Cottonwood's expert on interest rates, Scott Edwards, opined that that the market rate of interest of the type of loan made by JPI to Cottonwood is somewhere between 5.25% per annum and 6.25% per annum. Because Cottonwood's proposed interest rate of 5.86% per annum falls within that range, it is Mr. Edwards' opinion that the rate proposed in Cottonwood's Plan is reasonable. Mr. Edwards computed a LTV ratio of 65%. To determine the LTV ratio, Mr. Edwards divided an assumed $3,600,000 of debt by his $5,500,000 estimate of the value of the property pledged to JPI. Cottonwood asked him to assume that the amount of the debt to JPI is $3,600,000, and to assume $493,000 of NOI. Mr. Edwards determined value by dividing NOI of $493,000 by a cap rate of 9.0%. To determine the appropriate cap rate, Mr. Edwards reviewed three appraisals, one of which was on a commercial property. Mr. Edwards computed a DCR of 1.79, dividing total annual debt service under Cottonwood's proposed Plan (but excluding proposed debt service during the first 5.75 years after the Plan effective date to cure pre-petition arrearages) by NOI. He excluded the proposed debt service to cure the arrearage because he was unaware of it. Mr. Edwards testified that 65% was a low LTV ratio, and a strong DCR is anything over 1.25. His assessed JPI's loan to Cottonwood as a high quality loan based on an LTV of 65%, DCR of 1.79, and the excellent location of the property pledged to JPI.

Mr. Edward's expertise relating to interest rates is primarily focused on the rates charged by community banks for loans that include personal guaranties and the involve variable interest rates or fixed rates that do not exceed five years. Cottonwood retained Mr. Edwards as an expert in this case a few days before his report was due. In preparing his expert report, Mr. Edwards did not review JPI's proof of claim, was unaware of the proposed

debt service totaling more than $1,000,000 to cure prepetition arrearages, was not apprised that Cottonwood had distributed $525,000 of reserves to its members, did not review the creditworthiness of Baillios or Panera, and did not inspect the property.

Bank of Albuquerque, a local community bank, provided a letter to Cottonwood expressing an interest in providing a $3.6 million loan to Cottonwood, based on the two leases to Baillios and Panera and subject to further due diligence, underwriting, and an appraisal. The loan terms contained in the letter included a 5-year term, a twenty five year amortization, pro rata guaranties by the individuals who own interests in RSF and SED CAP, and an interest rate between 4.7% and 5.0% based on market rates in effect on November 22, 2011. The owner of SED CAP has numerous commercial loans with Bank of Albuquerque.

## DISCUSSION AND ANALYSIS

### I.    JPI's CLAIM

#### A.  Whether JPI is entitled to an acceleration fee

JPI asserts that it is entitled to allowance of a fee in the amount of $ 523,699.92 ("Additional Fee") arising from its pre-petition acceleration of the loan balance due under the Note and Mortgage executed by Cottonwood. JPI argues that 11 U.S.C. § 506(b), which caps a secured creditor's entitlement to recover fees, costs, and charges up to the value of the property securing the creditor's claim, applies only to fees, costs and charges that become due *post-petition*. Consequently, JPI asserts that 11 U.S.C. § 506(b) does not apply to the Additional Fee that it contends became due pre-petition. JPI argues further that, under New Mexico law, acceleration fees are treated as liquidated damages, and that the Additional Fee is enforceable under the New Mexico legal standard applicable to the enforceability of liquidated damages provisions in contracts. Because the Court finds, based on the evidence

before the Court, that it cannot determine whether the Additional Fee became due and payable pre-petition as a result of JPI's acceleration of the amounts due under the Note and Mortgage, and because the Court has denied confirmation on other grounds, the Court need not address either of JPI's arguments regarding its entitlement to the Additional Fee.

*The Provisions Contained in the Note and Mortgage Relating to the Additional Fee Appear to be Internally Inconsistent*

Paragraph 10.1 of the Note, entitled "Prepayment Premium," provides that JPI is entitled to a Prepayment Premium if the borrower prepays the Note in whole or in part after an initial no-prepayment period expires.[5] The Prepayment Premium is designed to maintain the lender's expected yield in the event of a prepayment. Paragraph 10.2 of the Note, entitled "Evasion of Prepayment Premium," paragraph and 14 of the Note, entitled "Acceleration," and paragraph 3.01 of the Mortgage, entitled Acceleration, provide for what is, in effect, an acceleration fee. The amount of the acceleration fee is equal to the amount the Prepayment Premium would have been had all amounts owing under the Note been paid in full on the date the acceleration fee is triggered. Paragraph 10.2 of the Note provides, in relevant part:

> [I]n the event of an acceleration of payment of this Note following an Event of Default by Maker, a tender of payment of an amount necessary to satisfy the entire indebtedness evidenced [by the Note], but not including the Prepayment Premium as required pursuant to the terms of this Note or the Mortgage, made at any time prior to and including a foreclosure sale or a sale ordered by court . . . shall be presumed to be and conclusively deemed to constitute a deliberate evasion of the prepayment provisions [of the Note] and shall constitute a prepayment [under the Note] and shall therefore be subject to the Prepayment Premium as calculated in accordance with this Note with the Prepayment Date being deemed the date of occurrence of the foreclosure sale or the tender of payment of the amount necessary to pay the entire indebtedness evidenced [by the Note] in full, including the Prepayment Premium.

Paragraph 14 of the Note provides:

---

[5] The amount of the Prepayment Premium is the greater of (a) 1% of the outstanding principal balance of the loan on the date of prepayment; or (b) an amount determined under a formula that takes into account the present value of the loan determined over the remaining term of the loan using a discount rate equal to a specified treasury yield.

-14-

Upon an Event of Default, Holder shall have the right, without demand or notice, to declare the entire principal amount of this Note then outstanding, and all accrued and unpaid interest thereon, and all other sums, including without limitation, the Prepayment Premium required under this Note or the Mortgage, to be immediately due and payable, and notwithstanding the stated maturity in this Note, all such sums declared due and payable shall thereupon become immediately due and payable.

Paragraph 3 of the Mortgage provides in relevant part:

Notwithstanding the stated maturity date in the Note, LENDER may without notice or demand, declare the entire principal amount of the Note and/or any Future Advances then outstanding and accrued and unpaid interest thereon, and all other sums or payments required thereunder including, but not limited to the Prepayment Premium described in the Note, to be due and payable immediately . . . .

A prepayment of an obligation logically cannot occur after the obligation has become due. However, paragraph 10.2 of the Note *deems* a tender of payment of the Note in full, after the obligation has become due as the result of an acceleration following an event of default, to be a prepayment triggering an obligation to pay the Prepayment Premium. The amount of the Additional Fee is the amount of the Prepayment Premium that would have been triggered by prepayment of the Note in full, without acceleration. Paragraph 14 of the Note makes the "Prepayment Premium *required under this Note or the Mortgage*" (emphasis added) immediately due and payable on acceleration. Paragraph 3.01 of the Mortgage provides likewise.

Paragraph 10.2 of the Note appears inconsistent with the acceleration provisions found in paragraph 14 of the Note and in paragraph 3.01 of the Mortgage. Paragraph 14 of the Note and paragraph 3.01 of the Mortgage provide that the Prepayment Premium *required under the Note* becomes due upon acceleration. However, under paragraph 10.2 of the Note, no Prepayment Premium is *required under the Note* at the time of acceleration. Under Paragraph 10.2 of the Note, the Additional Fee is only triggered upon a tender of payment of the Note in

-15-

full *after* acceleration, including payment as the result of a foreclosure sale or other court ordered sale. The provisions contained in paragraph 10.2 of the Note state that the Prepayment Date following acceleration is deemed to be "the date of occurrence of the foreclosure sale or the tender of payment" following acceleration. Consequently, it appears that the Prepayment Premium under the Note, absent an actual prepayment made prior to acceleration, is not required (is not owed) unless there is a tender of payment of the Note in full *after* acceleration.

Because of this internal inconsistency in the loan documents, the Court cannot determine based on the evidence before it whether an obligation to pay the Additional Fee has been triggered, either pre- or post-petition. Neither party proffered any parol evidence to explain the ambiguity created by these apparently inconsistent terms, nor did either party proffer evidence regarding who drafted the Loan Documents. Because the Court has denied confirmation of the Plan, there is no need for the Court to make a ruling on the enforceability of the Additional Fee without affording the parties an opportunity to present further evidence.

     B.  <u>Whether JPI is entitled to Interest on Expenses Incurred by JPI Pursuant to the Mortgage</u>

Cottonwood asserts that JPI is not entitled to interest on expenses it incurs pursuant to the terms of the Mortgage because there is no requirement under the Note for the Debtor to pay such interest. JPI counters that it is entitled to interest on expenses under the terms of the Mortgage. The Court agrees that JPI is entitled to interest on reimbursable expenses it incurs pursuant to the terms of the Mortgage, but with recourse only to its collateral in the event of default.

Paragraph 1.10 of the Mortgage provides, in relevant part:

BORROWER shall further pay all expenses of LENDER actually incurred, or contracted to by paid by LENDER (including reasonable attorneys' fees) incident to the protection or enforcement of the rights of LENDER hereunder, and enforcement or collection of payment of the Note or any Future Advance whether by judicial or nonjudicial proceedings, or in connection with any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceedings of BORROWER, or otherwise. *Any amounts disbursed by LENDER pursuant to this Section 1.10* shall be additional indebtedness of BORROWER secured by this Mortgage and each of the Related Agreements as of the date of disbursement *and shall bear interest at the Default Rate set forth in the Note, from demand until paid*. (emphasis added).

Paragraph 1.10 of the Mortgage clearly provides that interest on expenses JPI incurs or pays, including reasonable attorneys fees, pursuant to the Mortgage or collection of the Note, is a debt secured by the Mortgage. This gives JPI an *in rem* claim for interest on allowable expenses, including attorneys' fees.[6]

C. Whether JPI is entitled to post-petition interest at the contract default rate

Cottonwood does not dispute that JPI is entitled to post-petition interest, but contends that such interest should accrue at the non-default rate.[7] JPI contends that it is entitled to post-petition interest at the default rate accruing on its claim prior to the effective date of the Plan.

Section 506(b) of the Bankruptcy Code provides in pertinent part:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

---

[6]*See Springer Group Inc. v. Wittlesohn*, 128 N.M. 36, 52, 988 P.2d 1260, 1266 (Ct. App. 1999) (a person who was not a party to a note, but who was bound by the terms of a mortgage containing an attorney fee provision, had no personal liability for the plaintiff's attorney's fees, but the plaintiff did have an *in rem* claim for the attorney's fees); *Restatement (Third) of Property: Mortgages*, § 2.2(c) (to the same effect).

[7]Under 11 U.S.C. § 506(b), an oversecured creditor is entitled to post-petition interest at least to the extent of its equity cushion. *See In re Young,* 2011 WL 3799245, *8-9 (Bankr.D.N.M. Aug. 29, 2011).

In *U.S. v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the United States Supreme Court explained that:

> [r]ecovery of postpetition interest [for over-secured creditors] is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose.

*U.S. v. Ron Pair*, 489 U.S. at 241, 109 S.Ct. at 1030.

In analyzing default interest rates, courts have determined that the difference between the default and non-default rates of interest does not compensate a lender for the time value of money, and, therefore, is not true interest, but is a "charge" upon default for purposes of Section 506(b).[8] A majority of courts hold that the default rate of interest set forth in the contract presumptively applies unless it were to produce an inequitable result.[9]

In *In re Jack Kline Co., Inc.,* 440 B.R. 712 (Bankr.S.D.Tex.2010), the bankruptcy court identified several factors courts may consider to determine whether an over-secured creditor is entitled to post-petition interest at the default rate, including:

1. Whether the spread between default and non-default interest rates is large;

2. Whether the over-secured creditor was obstructing the bankruptcy process;

3. Whether junior creditors will be harmed if the over-secured creditor is awarded default interest;

4. Whether the over-secured creditor ever faced a realistic risk of nonpayment of its debt either before or during the bankruptcy proceedings;

---

[8] *See, e.g., In re AE Hotel Venture*, 321 B.R. 209, 215-216 and n.8 (Bankr.N.D.Ill.2005)(citing cases).

[9] *See In re Wolverine, Proctor & Schwartz, LLC,* 449 B.R. 1, 5 (Bankr. D.Mass. 2011)(observing that "[a] majority of courts has determined that the default rate of interest set forth in the contract presumptively applies unless it were to produce an inequitable result.")(collecting cases). *See also In re Market Center East Retail Property, Inc.*, 433 B.R. 335, 357-58 (Bankr. D.N.M. 2010)(observing that the rate of interest should be determined based on the contract unless such rate is unenforceable under applicable non-bankruptcy law, and observing further that if the contract rate does not adversely affect junior creditors, the court should enforce the contract rate).

5. Whether there is evidence that the non-default contract rate was the prevailing market rate of interest at the time of default and thereafter;

6. Whether there is any justification for an increased rate to compensate for an assumed increased risk following default; and

7. Any other equitable considerations.

*Jack Kline,* 440 B.R. at 745-746 (citations omitted).

Factors 1, 2, 3 and 5 weigh in favor of JPI. The 4 % difference between the default and non-default rates of interest rates is not excessively large. JPI has aggressively asserted its rights in this chapter 11 case, but in a professional and appropriate manner. There are no junior lien holders whose secured claims would be impaired by accrual of interest at the default rate. In the circumstances of this case, such interest accrual will not prejudice unsecured creditors. Further, Cottonwood has not asserted that the non-default interest rate at the time of default or at present is disproportionate to a market interest rate. Factor 4 is neutral. Factor 6 also weighs in favor of JPI.

Cottonwood urges that Factor 7, other equitable considerations, weighs heavily in its favor because JPI breached its duty of good faith and fair dealing by refusing to execute SNDAs to permit Cottonwood to re-let the property, instead intentionally making it impossible for tenants to occupy the building. Cottonwood contends this is tantamount to waste and a failure to mitigate damages. The Court disagrees. Cottonwood refused to execute SNDAs only after Cottonwood defaulted in its obligations to JPI, and after JPI had accelerated the outstanding balance under the Note. At that point, JPI's goal was to foreclose its lien as quickly as possible. Although Cottonwood presented credible evidence of an industry practice and custom for lenders not unreasonably to withhold approval of SNDAs in connection with a performing loan, there is no evidence before the Court of such an industry

practice or custom after a loan has been accelerated and the lender is seeking foreclosure. Cottonwood has not demonstrated that, at least after the loan had been accelerated, JPI had an obligation under its Loan Documents to approve SNDAs.

In any event, the evidence does not establish that JPI acted in bad faith. The anchor tenant Cottonwood has proposed is a local company. There is no evidence before the Court of its creditworthiness. Cottonwood argues that the creditworthiness of the tenants is irrelevant because if a tenant defaults, there is an expedited procedure under applicable New Mexico law for the landlord to recover possession to re-let the premises. Cottonwood reasons that a paying tenant at a market lease rate is, therefore, better than no tenant irrespective of the financial strength of the tenant. JPI presented evidence that the size and shape of Cottonwood's building makes it difficult to lease the space to a single user, and that the space becomes even more difficult to re-let after a default if divided into two spaces. Cottonwood did not present evidence to refute this testimony. The Court finds that JPI's expressed concern about converting a space designed for a single tenant into a multi-tenant space was credible, particularly in the absence of any reserve for contingencies held by Cottonwood or evidence of the creditworthiness of the tenants.

Additionally, while the Court is not finding bad faith on the part of Cottonwood and its members by Cottonwood distributing $525,000 of reserves held for debt service and tenant improvements to its members to protect the funds from JPI's collection efforts,[10] the distribution of the funds does show that Cottonwood and its members acted aggressively to protect their interests. JPI likewise acted aggressively to protect its interests. After weighing

---

[10]The Court is not finding that this conduct constituted bad faith because the Loan Documents did not contain a covenant prohibiting the distribution of reserves to members of Cottonwood and because the members deposited the distributed funds in segregated accounts. The members have made a portion of the funds available to Cottonwood for costs associated with re-tenanting the property and for operating expenses, and have expressed an intention to make the balance of the funds available for those purposes.

the relevant factors, the Court finds that JPI is entitled to post-petition interest at the default rate while this case is pending under chapter 11 until the effective date of a confirmed plan.

## II. CONFIRMATION ISSUES

The Option 2 treatment under of JPI's claims the Plan is operative only if JPI elects Option 2 by the effective date of the Plan. If JPI were to elect Option 2, it would consent to a reduction in the amount of its allowed secured claim and to the Plan's treatment of its claim under that option. JPI had not elected the Option 2 treatment, and has objected to confirmation. Accordingly, the Court will consider confirmation of the Plan in relation to the Option 1 treatment of JPI's claim.

### A. Whether JPI's Claim is Impaired, and, therefore Entitled to Vote on the Plan

Cottonwood asserts that the class consisting of JPI's claim is not impaired under the Plan; and, therefore, Cottonwood has satisfied the confirmation requirement of 11 U.S.C. § 1129(a)(8) and need not satisfy the cram down requirements of 11 U.S.C. § 1129(b). The Court disagrees with Cottonwood's assertion that JPI's claim is not impaired under the Plan.

*To Preclude a Determination of Impairment, Arrearages Must Be Cured As of the Plan's Effective Date*

Bankruptcy Code Section 1124 governs whether a claim is impaired in a Chapter 11 case. Cottonwood's Plan proposes to cure arrearages owed to JPI under the Loan Documents over the course of 5.75 years after the Plan's effective date. At the confirmation hearing and in its post-trial memorandum, Cottonwood argues that such a series of payments "cures any such default" for purposes of non-impairment under 11 U.S.C. § 1124(2)(A). In support of its position, Cottonwood analogizes its Chapter 11 Plan to a Chapter 13 plan wherein a debtor seeks to cure an arrearage on a mortgage loan on his residence over time, rather than on the

-21-

effective debt.  *See* Docket  # 106, pp. 4 – 6.  Cottonwood cites no case law in support of its position.  This Court finds that 11 U.S.C. § 1124 controls, and that payment of arrearages over 5.75 years is insufficient to "cure any default" as required under 11 U.S.C. § 1124(2)(A) to avoid impairment.  Consequently, JPI's claim is impaired under the terms of Cottonwood's Plan.

Bankruptcy courts that have addressed cure amounts under 11 U.S.C. § 1124(2)(A) appear to be virtually uniform in their opinion that the cure "must occur, in full, prior to or on the effective date of the plan in order to restore of the parties to their pre-default state.  The effect of § 1124(2) is to treat the claim as if default had not occurred, but this can only be accomplished if 'cure' occurs in full and immediately."  *In re Schatz*, 426 B.R. 24, 27 (Bankr.D.N.H. 2009).  *See also Tri-Growth Centre City, Ltd.*, 136 B.R. 848, 852 (Bankr.S.D.Cal. 1992); *In re Jones*, 32 B.R. 951 (Bankr.D.Utah 1983).  This interpretation is consistent with prior New Mexico bankruptcy case law.  *See In re Otero Mills, Inc.*, 31 B.R. 185, 186 (Bankr.D.N.M. 1983).

Although Cottonwood draws analogies between a debtor's cure rights under Chapter 13 and the cure provisions of 11 U.S.C. § 1124 governing claim impairment in Chapter 11 cases, Chapter 13 actually contains no analogous provision to Section 1124.  Further, unlike Chapter 13 cases, the concept of impairment in Chapter 11 cases affects whether a class of claims may vote to accept or reject a plan, and whether a plan proponent must satisfy fair and equitable and no undue discrimination requirements to satisfy confirmation requirements with respect to a dissenting class of claims.  *See* 11 U.S.C. §§ 1126(f), 1129(a)(8) and 1129(b). The ability to cure an arrearage over the life of a Chapter 13 plan is not analogous to the cure provisions for purposes of non-impairment in Chapter 11.  Moreover, even if it were, the non-

impairment provisions of Chapter 11 simply do not permit a situation like the one at issue, wherein the debtor proposes to spread out cure amounts over the course of 5.75 years, a time period that is longer even than the maximum plan length allowed under Chapter 13.

*Requiring an SNDA Alters the Legal and Contractual Rights of JPI*

Cottonwood's Plan seeks to impose on JPI an SNDA between JPI and Baillios, and between JPI and Panera, that contains the same terms as the former SNDA between JPI and the now-defunct former tenant, Circuit City. Cottonwood argues that the only thing that has changed about this agreement, which is commonplace between lenders and sophisticated tenants, are the tenants themselves, and that JPI's rights are thus not truly affected by this treatment under the Plan. The Court disagrees.

In order to maximize creditor participation in the confirmation process, the Code broadly defines the term 'impairment' under 11 U.S.C. §1124. *See In re Elijah,* 41 B.R. 348, 351 (Bankr.W.D.Mo. 1984). "The Code carves out three [now only 2] narrow exceptions according to which a claim will be considered unimpaired", thereby deeming all others impaired and entitled to vote on the plan. *In re American Solar King Corp.,* 90 B.R. 808, 819 (Bankr.W.D. Tex. 1988). "[E]ven the smallest impairment entitles a creditor to participate in voting." *Id.*

Cottonwood is correct that the value of a claim is not determinative of whether the claim is "impaired" within the meaning of Section 1124. *See In re Barrington,* 15 B.R. 952, 962 (Bankr.D.Utah 1981). Rather, the emphasis under Section 1124 is on **rights**, not values: A class is impaired under a plan unless "the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder...." 11 U.S.C. § 1124(1). *See also Barrington,* 15 B.R. at 962-963 and n. 23. As the Ninth Circuit explained in *In re L*

*& J Anaheim Associates*, 995 F.2d 940, 943 (9th Cir.1993): "As our analysis above makes clear, we have no occasion to ask whether [the creditor's] rights were effectively enhanced or diminished under the Plan; our inquiry ends with the conclusion that those rights were changed." Therefore, "a class is impaired where rights to the claims are altered, *even if such alteration enhances or has no impact on the value of the claims*." *In re Boston Post Road Ltd. Partnership*, 154 B.R. 617, 623 (D.Conn.1993)(emphasis added), *aff'd on other grounds*, 21 F.3d 477 (2d Cir.1994). As such, the standard for impairment is very lenient; "any alteration of the rights constitutes impairment even if the value of the rights is enhanced." *Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir.1995), *citing* 5 *Collier on Bankruptcy* ¶ 1124.03[1] (15th ed. 1994).

This Court finds that substituting new parties in a previously-made agreement, particularly when Cottonwood has already placed the collateral into a default situation, effectively changes JPI's rights. Both the parties and circumstances under which the proposed SNDA would be made are different than those under which the previous SNDA was executed. This is sufficient to find impairment. As discussed further below, SNDAs typically are negotiated agreements so that SNDAs with different tenants may contain different terms. Because the Plan changes some of JPI's rights, JPI is impaired.

Therefore, JPI is entitled to vote as an impaired creditor under Cottonwood's Plan.

B. <u>Whether Cottonwood's "Artificial Impairment" of Class 3 Bars Confirmation</u>

JPI asserts that the Cottonwood has failed to satisfy the confirmation requirement contained in 11 U.S.C. § 1129(a)(10). Under 11 U.S.C. § 1129(a)(10), if a plan includes an impaired class of claims, at least one impaired class must vote to accept the plan. The Court has already determined that JPI is impaired, and JPI has voted to reject Cottonwood's Plan.

-24-

Consequently, confirmation is contingent upon another impaired class of claims accepting Cottonwood's Plan. The only other class that arguably is impaired is Class 3. JPI asserts that although Class 3, the class of unsecured non-priority claims, has accepted the Plan, the acceptance by Class 3 should be disqualified for purposes of 11 U.S.C. § 1129(a)(10) because Cottonwood artificially impaired the claims in Class 3 in order to engineer an accepting class of impaired claims.

Bankruptcy Code § 1129(a)(10) is designed to prevent a plan from being confirmed unless a class of creditors holding claims impaired by the plan support confirmation.[11] The Bankruptcy Code does not expressly prohibit artificial impairment of a class of claims, nor does the Bankruptcy Code expressly require a plan proponent to make efforts not to impair a class.[12] Nevertheless, many courts hold that a plan cannot be confirmed if a plan proponent artificially impairs a class in order to engineer an accepting class of impaired claims, finding that artificial impairment violates the impaired accepting class requirement found in 1 U.S.C. § 1129(a)(10) or violates the good faith requirement found in 11 U.S.C. § 1129(a)(3).[13] To determine whether a class of claims has been artificially impaired in such a manner as to

---

[11] *See In re Windsor on the River Assoc., Ltd.*, 7 F.3d 127, 131 (8th Cir.1993) ("The purpose of [Bankruptcy Code § 1129(a)(10) ] 'is to provide some indicia of support [for a plan] by affected creditors and prevent confirmation where such support is lacking.'") (quoting *In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 (Bankr.D.Conn.1989)).

[12] *See In re Greenwood Point, LP*, 445 B.R. 885, 908 (Bankr. S.D.Ind. 2011)(stating that "nothing in the Bankruptcy Code prevents a debtor from negotiating a plan in order to gain acceptance, including impairment of claims[,]" and observing further that " 'nowhere does the Code require a plan proponent to use all efforts to create unimpaired classes.'")(quoting *Connecticut Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson),* 165 B.R. 470, 475 (9th Cir. BAP 1994)(citation omitted)).

[13] Court are split regarding whether the creation of an artificially impaired class of claims violates 11 U.S.C. § 1129(a)(10) or instead violates the requirement of 11 U.S.C. § 1129(a)(3) that a plan must be proposed in good faith. *See In re Village at Camp Bowie I, L.P.*, 454 B.R. 702, 708-09 (Bankr. N.D.Tex. 2011)(surveying the case law) and *In re Quigley Co., Inc.*, 437 B.R. 102, 126 (Bankr. S.D.N.Y. 2010) (surveying the case law). The Court need not decide which view is better, because either approach yields the same result.

-25-

violate 11 U.S.C. § 1129(a)(3) or 11 U.S.C. § 1129(a)(10), courts consider whether there was an economic or other good business reason for the impairment.[14]

JPI cites *In re Dunes Hotel Associates,* 188 B.R. 174 (Bankr.D.S.C. 1995) and *In re Washington Associates,* 147 B.R. 827 (E.D.N.Y. 1992) for the proposition that an unsecured creditor class is impermissibly artificially impaired if the debtor's partner could have funded payment of unsecured claims in full on the effective date of the plan. In *Dunes*, the debtor owned a hotel worth at least $52,000,000, and the debtor's partner had committed to fund forty million dollars on the effective date of the plan from a new value contribution to pay down a secured claim. The debtor's legal counsel was the sole member of Class 7, holding an unsecured claim in the amount of $2,139.57. Ordinarily, the debtor paid its attorney's fees from funds generated from its hotel operations. Under these circumstances, the *Dunes* court found that the debtor had failed to articulate any credible reason why impairment of the claim for attorney's fees was necessary for economic or other justifiable reasons, and determined that the debtor impaired the class solely to satisfy the requirements of 11 U.S.C. § 1129(a)(10).

In *Washington Associates*, the District Court affirmed the bankruptcy court's determination that the debtor could not separately classify the unsecured deficiency claim of

---

[14]*In re Dunes Hotel Associates*, 188 B.R. 174, 184–189 (Bankr.D.S.C.1995) (artificial impairment found where the accepting impaired class was impaired without an economic justification); *In re Fur Creations By Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr.S.D.N.Y.1995)("There must be a showing that the proposed impairment is necessary for economical or other justifiable reasons and not just to achieve 'cram down.'"). After the 1994 amendments to the Bankruptcy Code, which deleted the exception for claims that were "cashed out" on the effective date of the plan, some courts suggest that "the concept of artificial impairment is much more difficult to justify" and that "'a claim need not and cannot be artificially impaired.'" *In the Matter of Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 240 (Bankr.D.N.J. 2000)(citing *In re Atlanta-Stewart Partners,* 193 B.R. 79 (Bankr.N.D.Ga. 1995) and quoting John R. Clemancy and Glenn A. Saks, "Even an Act of Congress Can't Stop the Fight Over Artificial Impairment", 17 AM.BANKR.INST.J. 18, 25 (Nov. 1998)(remaining citations omitted)). *See also, In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 32 (Bankr.D.Kan. 2001)(observing that "since classes that receive payment in full on the effective date of the plan are impaired, claims that are cashed out  some time after the effective date must be impaired, as well.")(citations omitted).

Case 11-12663-j11    Doc 109    Filed 02/17/12    Entered 02/17/12 14:22:04 Page 26 of 50

its secured lender from other unsecured trade debt in order to satisfy 11 U.S.C. § 1129(a)(10). *Washington Associates,* 147 B.R. at 832. The *Washington Associates* court concluded that the debtor "could not propose a confirmable plan without improperly classifying creditors[;]" consequently the creditor was entitled to relief from the automatic stay and the bankruptcy court was "free to dismiss the petition." *Id.* Below, the bankruptcy court observed that "[t]he $26,800 of the unsecured [trade debt] claims *may well be* an artificially impaired class" because it appeared that the debtor would have sufficient funds to pay the claims in full at confirmation, or that, if not, the debtor's partners would have access to sufficient funds to pay those claims, but the court did not expressly find that the class of trade debt claims was artificially impaired. *Washington Associates,* 147 B.R. at 831. Both *Dunes Hotel* and *Washington Associates* are distinguishable from the facts present here.

The Class 3 claims in Cottonwood's Plan consist of sixteen claims totaling $46,372.80. This amount is not *de minimus.* These claims consist primarily of unpaid ordinary operating expenses that were incurred pre-petition, but became due post-petition. Cottonwood does not have sufficient funds on hand to pay all Class 3 claims in full on the effective date of the Plan and at the same time reserve sufficient funds to pay its foreseeable ordinary operating expenses and make a reasonable provision for contingencies. As of December 31, 2011, Cottonwood had available cash totaling only $23,524.05.[15] And while there remains approximately $30,000 in the segregated accounts distributed to Cottonwood's members from the reserve fund in excess of the estimated amount necessary to pay costs associated with leasing Cottonwood's premises to Baillios and Panera, Mr. Smoak testified

---

[15] Cottonwood argues that $22,088.02 of these funds are restricted funds not available to pay Class 3 claims because the funds are proceeds of rents pledged to JPI, and there is no cash collateral order permitting expenditure of rents. However, under the proposed plan, there is no restriction on Cottonwood using rents to pay operating expenses and to make debt service.

that the $30,000 figure is only an estimate. The actual amount needed to pay the costs associated with leasing the premises to Baillios and Panera could be higher or lower.

A debtor is not required to expend substantially all of its available funds to pay a class in full on the effective date of the plan to avoid impairing the class, thereby leaving insufficient capital in the debtor to fund its future operations. In *In re Greenwood Point*, LP 445 B.R. 885, 908-909 (Bankr. S.D.Ind. 2011), the bankruptcy court held that the debtor was not required to use a portion of its $150,000 tenant improvement reserve to pay creditors when the debtor had a good business reason for the reserve. The fact that the debtor could have used these funds to pay the claim in full did not make the claim "artificially impaired" contrary to the requirements of 11 U.S.C. § 1129(a)(10). *Id.* at 909. Similarly, in *In re Memorial Products Co., Inc*., 212 B.R. 178 (1st Cir.BAP 1997) the Bankruptcy Appellate Panel for the First Circuit found that a debtor's need of cash for continued operation is valid cause to defer payment to creditors and thereby to impair their claims. *Memorial Products,* 212 B.R. at 184. The *Memorial Products* court further observed that a debtor need not compromise the feasibility of its own plan by using cash to pay creditors on confirmation that otherwise is needed to pay foreseeable expenses and to make a reasonable provision for contingencies. *Id.* JPI's expert testified that it would be prudent for Cottonwood to have a reserve of at least $250,000 to re-tenant the property if Baillios or Panera were to default under their leases and for debt service. This estimate of a prudent reserve amount by JPI's expert is well in excess of the actual amount of cash Cottonwood has on hand, including the estimated excess currently held in the members' segregated accounts. Thus, despite the fact that Cottonwood's members have historically paid Cottonwood's ordinary operating expenses when Cottonwood had insufficient funds to pay those obligations on a current basis, and

despite the fact that, post-petition, its members chose not to pay any outstanding pre-petition debts, the Court finds that Cottonwood has a legitimate business purpose for not paying the Class 3 claims in full on the effective date of the Plan. Cottonwood's impairment of Class 3 has an economic justification. Consequently, Class 3's vote to accept Cottonwood's Plan satisfies the requirements of 11 U.S.C. § 1129(a)(10). Further, Cottonwood's impairment of Class 3 does not run afoul of the good faith requirements of 11 U.S.C. § 1129(a)(3).

C. Determining the proper discount rate under *Till*

Both parties agree that to determine whether the proposed interest rate on JPI's claim complies with the requirements of § 1129(b)(2)(A)(i), the rate should be calculated using the formula approach articulated by the Supreme Court's plurality opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004)("*Till*").[16] This formula approach requires the Court to determine, when an efficient loan market to the debtor does not exist, the appropriate rate of interest by looking first to a base rate (in *Till*, the Court used the prime rate) that would be charged to a high-quality borrower. Then, the Court must add an appropriate risk adjustment to the base rate "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers[]." *Till,* 541 U.S. at 479. Under *Till,* the Court starts from a "concededly low estimate" and then adjusts upwards for the situation-specific risks present. The evidentiary burden for establishing an appropriate interest rate under *Till* falls "squarely on the creditors." *Id.*

As both parties stated in their briefs and as the Supreme Court enumerated, some of the risk factors to be analyzed include (1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative

---

[16] *Till* involved a chapter 13 debtor's attempt through a Chapter 13 plan to cram down the interest rate for a loan secured by a vehicle.

-29-

expenses of enforcement. This is an objective inquiry. The Supreme Court states that the formula approach "depends only on the state of the financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or prior interactions with the debtor." *Till,* 541 U.S. at 479-80.

Application of *Till* often involves competing expert opinions, and it is not unusual for a bankruptcy court to heavily or completely discount one expert's opinion when determining the appropriate interest rate.[17] Cottonwood's position is inconsistent on the *Till* issue. Its post-trial brief argues that the *Till* analysis should be employed, yet its expert, Mr. Edwards, performed no such analysis. Mr. Edwards' opines on the characteristics of the property and the proposed set of tenants, reviews the market, and finally determines that the *market rate* for such a loan would fall "somewhere between 5.25% and 6.25%." Because the Cottonwood's proposed use of the contract rate of interest falls within this range, Cottonwood's expert concludes that the proposed interest rate is consistent with a market rate.

The Court does not fault Mr. Edwards. He was not hired to do the analysis until just a few days before the expert report was due. Additionally, Mr. Edwards was working from a flawed set of assumptions. First, he calculated ratios (LTV and DCR) central to his analysis using loan and debt service amounts that are substantially lower than amounts Cottonwood concedes must be paid. Mr. Edwards worked from the assumption that the loan balance owing to JPI was $3.6 million, when, in actuality, Cottonwood stipulated for confirmation purposes that JPI's claim was approximately $300,000 more than that. Second, his debt service calculations did not include the arrearage cure payments exceeding $1 million that

---

[17] *See, e.g., In re Village at Camp Bowie I, LP,* 454 BR 702, 713 (Bankr.N.D.Tex. 2011) (although the dueling experts in that case both employed a *Till* analysis, the Court used only one expert's approach because it was "more thoughtful and better documented than that of [the other expert]"); *In re SW Boston Hotel Venture, LLC,* 460 B.R. 38, 58 (Bankr.D.Mass.2011)("The Court credits [one expert's] opinion for a variety of reasons, including… the detailed and legally appropriate approach he followed in applying the *Till* formula.").

Cottonwood proposes to pay over the first 5.75 years of the Plan. These deficiencies are significant, and, for that reason, the Court will heavily discount Mr. Edwards's expert opinion for purposes of determining an appropriate interest rate under *Till.*

JPI's expert, Mr. Gracey, whose commercial real estate loan experience spans seven decades, *did* perform a thoughtful *Till* analysis. The Court, by and large, finds Mr. Gracey's testimony and expert report to be credible. Because the collateral, loan repayment term, and type of debtor are quite different in this case than in *Till,*[18] Mr. Gracey used the 10-year treasury yield of 2% as the beginning base rate. The Court deems this rate appropriate, especially given Mr. Gracey's explanation that "For many years now, the pricing begins with a corresponding maturity treasury yield. The prime rate [… is] only considered in shorter term transactions," in this market generally a fixed rate of interest for a period of five years or less. Cottonwood proposed a fixed rate of interest for a fifteen year term. Thus, the Court finds that a 2% interest rate is the correct beginning point in this case used under the formula approach.

For a healthy borrower, Mr. Gracey testified that lenders add a premium to the 10-year treasury yield in order to arrive at an acceptable market rate of interest for a high quality loan. A fixed rate of interest for a longer period generally necessitates a higher premium to the treasury yield to compensate a lender for the risk of increasing market interest rates, particularly when the loan is made in a low interest rate environment. Mr. Gracey tacked on a 3.5% premium to the 10-year treasury yield, which he stated is the "current market spread for quality 65% LTV deals. The Court notes that Edward's expert report assumed a 65% LTV. This Court finds that 3.5% is an acceptable tack-on spread to add to the 10-year treasury yield

---

[18]In *Till,* the national prime rate was an appropriate starting rate of interest because the loan at issue involved a consumer debtor who was paying off a car loan over three years.

for a high quality loan of the type JPI made to Cottonwood. Thus the effective base rate, including the 3.5% premium, is 5.5% per annum.

From the effective base rate, Mr. Gracey added an additional 3% risk adjustment in 1.5% increments, the first for "High risk LTV and very poor DC ratio" and the second for "Additional risk associated with a 'Sub-Prime' borrower."[19] The Court will address these in reverse order.

The Court discounts the second 1.5% risk adjustment. Mr. Gracey assessed Cottonwood as a sub-prime borrower because it made the decision in a depressed market environment to protect its reserve for use to re-tenant the property instead of using the funds to make debt service. Although such a decision may be antithetical to a lender's expectations of a borrower, it does not establish Cottonwood as an inherently sub-prime borrower. The formula approach under *Till* does not consider prior interactions between the lender and the debtor. *Till* at 479-480. For this reason, the Court does not make the requested risk adjustment of 1.5% premised on Cottonwood being a "sub-prime" borrower.

The Court does, however, agree with JPI's expert that the Plan, as currently proposed, requires a 1.5% risk adjustment to the interest rate charged to a healthy borrower. There are substantial risk points for the lender in this case which necessitate an additional risk adjustment. First, there has been no evidence regarding the creditworthiness of Cottonwood's tenants.[20] Additionally, there are no reasonable cash reserves for tenant improvements, debt service, or other contingencies. The risk associated with the absence of a reasonable reserve

---

[19]The Court notes that Cottonwood's proposed (reinstated contract) rate is only .36 points above the 5.5% base rate for a quality loan. For the Court to reinstate the contract rate under the formula approach, Cottonwood would need to propose a sounder plan than the one it has proposed.

[20] Although Panera is part of a large, successful restaurant chain, it was noted at the hearing that the proposed tenant is a subsidiary of a well-capitalized publicly traded parent company. JPI has not received assurance that its parent company would stand behind it, though this Court doubts that a successful parent company would allow its brand name to be tarnished by its subsidiary.

is exacerbated by the substandard debt coverage ratio and projected net operating income for the first 5.75 years of the Plan. The loan-to-value ratio also supports this 1.5% risk adjustment. After application of the formula approach described in *Till*, this Court holds that the Plan, as currently formulated, requires an interest rate of 7% per annum for cram down under 1129(b) (2)(A)(i).[21]

D. Binding JPI to SNDAs in Favor of Baillios and Panera

Cottonwood's Plan contains the terms and conditions of an SNDA, and provides that upon confirmation of the Plan JPI would be deemed to have agreed to those terms and to have executed an SNDA. JPI points out that nothing in the Loan Documents requires it to agree to an SNDA, and argues further that nothing in the Bankruptcy Code permits confirmation of a plan that would bind JPI to the terms of an SNDA. While the Court agrees that nothing in the Loan Documents requires JPI to agree to an SNDA, at least after Cottonwood is in default, the Court concludes that, consistent with the requirements under 11 U.S.C. §§ 1129(a)(1) and 1129(b)(2)(A)(iii), a chapter 11 plan may, in appropriate circumstances, bind a lender to the terms of an SNDA even when the applicable loan documents do not contain such a requirement. However, the Court finds that under the facts and circumstances of this case, Cottonwood has not satisfied the confirmation requirements necessary to bind JPI to the SNDA contained in the Plan.

---

[21] 2% treasury 10-year treasury yield + 3.5% premium + 1.5% risk adjustment = 7%

1. The Bankruptcy Court Cannot Bind JPI to an SNDA If No Plan is Confirmed

   *Under the Circumstances of this Case, JPI is not Required Under the Loan Documents to Execute an SNDA under the General Implied Covenant of Good Faith and Fair Dealing*

Cottonwood asserts that under the implied covenant of good faith and fair dealing inherent in all written contracts,[22] JPI should be required to accede to Cottonwood's reasonable expectations that JPI would agree to execute in favor of a substitute tenant an SNDA that contains terms identical to the terms of an SNDA that JPI executed in favor of the original tenant. The purpose of the implied covenant of good faith and fair dealing is to ensure that neither party takes any action that will injure the other party's rights to receive the benefit of their bargain.[23]

At the final hearing, representatives and experts who testified on behalf of JPI testified that Cottonwood asked JPI to execute SNDAs to facilitate the leases to Baillios and Panera only after Cottonwood had defaulted under the Note and Mortgage, and after JPI had accelerated the balance owing under the Note. Further, the evidence established that JPI was, in good faith, concerned with Cottonwood's intention to divide the leasable space to accommodate two tenants instead of just one, and that dividing the space designed for one tenant for use by two tenants would render the premises more difficult to re-let if one of those tenants defaulted. In addition, the Court finds that JPI has a legitimate concern about the creditworthiness of Baillios as a tenant. Baillios is a local company. Cottonwood presented no evidence regarding the creditworthiness of Baillios as a tenant in support of confirmation. Without deciding whether the implied covenant of good faith and fair dealing in loan

---

[22] *See Sanders v. Fedex Ground Package System,* 144 N.M. 449, 452, 188 P.3d 1200, 1203 (2008)(stating that "New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract.")(citations omitted).

[23] *Sanders,* 144 N.M. at 452, 188 P.2d at 1203.

documents may in some circumstances impose an affirmative duty on the part of a lender to execute an SNDA, the Court finds that, under the circumstances present here, JPI is not required by an implied covenant of good faith and fair dealing in the Loan Documents to enter into an SNDA with each of Baillios and Panera.

### *The State Court Judgment Has Preclusive Effect as to State Court Issues but Not Confirmation Issues*

JPI argues that this Court is bound by the findings of the state court order which denied Cottonwood's request for a permanent injunction compelling JPI to execute a SNDA. Neither the *Rooker-Feldman* doctrine (which bars a lower federal court may from reviewing a final order entered by a state court),[24] the Full Faith and Credit Act (which requires the court to give the same preclusive effect to the decision of a state court that another state court would give[25]), nor principals of collateral estoppel (which bars parties from re-litigating ultimate facts or issues decided in prior litigation between the parties) bars the Court from considering, within the context of Chapter 11 plan confirmation, whether the Cottonwood can include a provision in its Plan that serves as the functional equivalent of an SNDA.

Collateral estoppel, or issue preclusion, requires a showing of the following elements: "'(1) the subject matter or causes of action in the two suits are different; (2) the ultimate fact or issue was actually litigated; (3) the ultimate fact or issue was necessarily determined; and (4) the party to be bound by collateral estoppel had a full and fair opportunity to litigate the

---

[24] *See In re Miller*, __ F.3d __, 2012 WL 286865, *4 (10th Cir. 2012)("The Rooker– Feldman doctrine precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court." Attempts to relitigate an issue determined in a state case is  properly analyzed under issuer prelusion principles not the Rooker-Feldman Doctrine.).
[25] *See, In re Claude W. Blackwell*, 2010 WL 3037583,  *2 (Bankr.D.N.M. 2010)("Under the Full Faith and Credit Act, federal courts are required to give full faith and credit to judgments entered by all courts in the United States, meaning that 'a federal court must give the same preclusive effect to a state-court judgment as another court of that state would give.'")(quoting *Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 771, 88 L.Ed.2d 877 (1986)).

issue in the prior suit.'"   *In re Beaver,* 437 B.R. 410, 411 (Bankr.D.N.M. 2010(quoting

*Reeves v. Wimberly,* 107 N.M. 231, 233, 755 P.2d 75, 77 (Ct.App. 1988)).

   The State Court, applying applicable New Mexico law, determined that a permanent

injunction should not issue compelling JPI to execute SNDAs in favor of Baillios and Panera.

This Court acknowledges that it must give preclusive effect to the decision if it were to

consider issuing such an injunction based solely on New Mexico law.  However, the

determination of the state court denying the Cottonwood's request for mandatory injunction

does not have collateral estoppels effect in connection with confirmation of the Plan for

several reasons.  First, the ultimate fact matter before the Court now is not whether the Court

can compel JPI to execute an SNDA under applicable state law while the loan is in default.

The issue to be decided by this Court is whether Cottonwood's Plan, which includes a

provision that JPI shall be bound by the terms and conditions of an SNDA favor of Baillio's

and Panera contained in the Plan, meets the requirements of the Bankruptcy Code necessary

to confirm the Plan.  Further, any factual determination by the State Court that members of

the Cottonwood acted in bad faith in connection with their pre-petition dealings with JPI in

the past is not sufficient to serve as a finding that Cottonwood has not proposed its Plan in

good faith in violation of 11 U.S.C. § 1129(a)(3).[26]

> ### *The Court's equitable powers under 11 U.S.C. § 105 does not give the Court unbridled discretion to compel JPI to execute an SNDA in favor of the new tenants*

   JPI asserts, and the Court agrees, that it cannot compel JPI to execute SNDAs in favor

of Baillios and Panera by relying solely on its equitable powers under 11 U.S.C. § 105.

Section 105 authorizes the court to "issue any order, process, or judgment that is necessary or

---

[26]*Cf.  In re Torres Martinez,* 397 B.R. 158,  (1st Cir. BAP 2008)(Chapter 13 confirmation order necessarily determined that the *plan* was filed in good faith, but did not preclude a request for dismissal of  the debtor's Chapter 13 case on grounds that the debtor filed the *petition* in bad faith).

Case 11-12663-j11    Doc 109    Filed 02/17/12    Entered 02/17/12 14:22:04 Page 36 of 50

appropriate to carry out the provisions of this title," but it does not "'constitute a roving commission to do equity.'" *In re Scrivner,* 535 F.3d 1258 (10th Cir. 2008) (quoting *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986)). For this Court to grant injunctive relief, such relief must be necessary or appropriate to carry out the provisions of Title 11.

2. It is possible to achieve the equivalent of an SNDA through a reorganization plan over a creditor's objection, provided the plan otherwise meets the requirements for cramdown.

Cottonwood correctly points out that, under 11 U.S.C. § 1123(b)(5), a Chapter 11 plan may "modify the rights of holders of secured claims." 11 U.S.C. § 1123(b)(5). Thus, the issue here is whether Cottonwood can cram down its Plan over JPI's vote to reject the Plan. "In reorganizing the bankrupt entity, a secured creditor's interests in the debtor's property can be 'dealt with' in a variety of ways: through modification, impairment, exchange, or even elimination." *In re Airadigm Communications, Inc.,* 519 F.3d 640, (7th Cir. 2008)(referencing 11 U.S.C. § 1129(b)(2)(A)(i)(I), § 1129(b)(2)(A)(i)(II), § 1129(b)(2)(A)(iii) and § 1126(d)).

3. The Effect of *Stern v. Marshall* on the Court's Jurisdiction to Issue an Injunction to Impose SDNAs on JPI.

JPI asserts that it is questionable whether, in light of the Supreme Court's decision in *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), that this Court has jurisdiction to enter a judgment for injunctive relief or otherwise to bind two non-debtor parties to an SNDA. The Court disagrees that *Stern v Marshall* precludes the Court from confirming a plan that would bind a lender to terms that afford a debtor and its tenants with the functional equivalent of an SNDA.

In *Stern v. Marshall*, the Supreme Court held in a 5-4 decision that the statutory grant of authority to bankruptcy judges set forth in 28 U.S.C. § 157(b)(2)(C) to hear and determine "counterclaims by the estate against persons filing claims against the estate" exceeds the

limits of Article III of the Constitution where 1) the counterclaim by the estate seeks a monetary recovery from a creditor to augment the estate; 2) the counterclaim is based in tort governed wholly by state law; 3) resolution of the counterclaim is not necessary to resolve the allowance or disallowance of the claim itself; and 4) the creditor did not consent to the bankruptcy court determining the counterclaim. *Stern v. Marshall,* 131 S.Ct. at 2620. The Supreme Court did not hold in *Stern v. Marshall* that a bankruptcy court may never hear and determine state law claims.

Because the Court is denying confirmation on other grounds, the Court need not decide whether *Stern v. Marshall* otherwise implicates the Court's authority to enjoin JPI by compelling it to take actions or refrain from taking actions in accordance with the SNDA terms contained in the Plan. The Court notes that as to the Baillios and Panera leases, Cottonwood could avoid the issue by modifying the SNDA language in the Plan. Instead of imposing obligations on JPI or creating an agreement between JPI and third party tenants, the Plan could modify JPI's liens rights against the real property and any casualty or condemnation proceeds relative to the leasehold interests of tenants. *See* 11 U.S.C. § 1123(a)(5)(E)(providing that a plan may modify a lien).[27] Such a provision would effectively accomplish the same thing.

    E.  <u>Cram-down requirements under 11 U.S.C. 1129(b)(1) and § 1129(b)(2)</u>

Section 1129(b)(1) requires that a plan be fair and equitable with respect to a dissenting class.[28] Section 1129(b)(2) contains specific requirements that must be satisfied to

---

[27] *See also, In re Crystian,* 197 B.R. 803, 804 (Bankr.W.D.Pa. 1996)(stating that the secured claim "can be modified under 1123(a)(5)(E), if the modification is fair and equitable under § 1129(b)(2)."); *In re Lennington,* 288 B.R. 802, 804 (Bankr.C.D.Ill. 2003)(noting that "under Section 1123(a)(5)(E), a plan may modify any lien.")

[28] Section 1129(b)(1) provides, in relevant part:

comply with the fair and equitable requirement of 11 U.S.C. § 1129(b)(1), but satisfaction of those requirements does not assure compliance with the more general fair and equitable requirement of that Section 1129(b)(1).[29] To determine whether a plan meets the fair and equitable requirement of 11 U.S.C. § 1129(b)(1), with respect to a dissenting class of secured creditors, the court should consider several factors in addition to the specific requirements found in 11 U.S.C. § 1129(b)(2)(A), including:

1. Whether the length of time for the proposed payment of debt is reasonable;

2. Whether the proposed payment demonstrates a good faith effort to pay the debt;

3. Whether the risks are unduly shifted to the creditor;

4. Whether the creditor's interest in its collateral is adequately protected, which may include consideration of such factors as the projected loan to value ratio during the period of repayment, the nature of the collateral, and whether the value of the collateral will likely appreciate, depreciate, or be stable;

5. Whether any secured loan restructure, including default provisions and other covenants, is reasonable when compared to industry customs and practices and the parties' previous understandings and practices; and

6. Whether there is any special prejudice to the dissenting class arising from its particular circumstances.[30]

The more specific "fair and equitable" requirements found in 11 U.S.C. § 1129(b)(2)(A) may be satisfied by meeting one of the following three requirements with

---

. . . the court . . . shall confirm the plan notwithstanding the requirements of such paragraph [(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. § 1129(b)(1).

[29] Section 1129(b)(2) provides that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements:" (emphasis added), and then details various requirements in subparts (A), (B) and (C). Section 102(3) provides that the word "includes" is not limiting. Therefore, satisfaction of the requirements of Section 1129(b)(2) does not assure satisfaction of the fair and equitably requirements of Section 1129(b)(1). *See In re Trenton Ridge Investors*, *LLC*, 461 B.R. 440, 498-99 (Bankr. S.D. Ohio 2011) (citing numerous cases).

[30] For cases relying on one or more of these factors to determine whether a plan is fair and equitable, see *In re Renegade Holdings, Inc.*, 429 B.R. 502, 530 (Bankr M.D. N.C. 2010)(applying factors to treatment of a class of unsecured creditors); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 486 (Bankr S.D. Ohio 1994); *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr. W.D. Tenn. 1991) (applying factors relevant to a negatively amortizing loan).

respect to a class of secured creditors: 1) the secured creditor's lien retention, plus its receipt of deferred cash payments in the amount of the creditor's allowed claim with interest at an appropriate rate; 2) sale of property free and clear of a secured creditor's lien, subject to Section 363(k) rights, with the creditor's lien attaching to the sale proceeds and treatment of the lien on proceeds under the first or third requirement; or 3) the secured creditor's realization of the "indubitable equivalent" of its claim. 11 U.S.C. § 1129(b)(2)(A). To be confirmed, the Plan need satisfy only one of these three requirements. *Wade v. Bradford,* 39 F.3d 1126, 1130 (10th Cir. 1994)(observing that "[t]hese requirements are written in the disjunctive, requiring the plan to satisfy only one before it could be confirmed over creditor's objection."); *In re Philadelphia Newspapers, LLC,* 418 B.R. 548, 567 (E.D.Pa. 2009), *aff'd,* 599 F.3d 298 (3rd Cir. 2010)("section 1129(b)(2)(A) . . . provides three distinct alternative arrangements for satisfaction of plan confirmation in the context of cramdown of a dissenting class of secured creditors and . . . may select any of these to proceed to confirmation.").

      1.   <u>The Plan does not satisfy the requirements of 11 U.S.C. § 1129(b)(2)(A)(i).</u>

Cottonwood first asserts that it has satisfied the fair and equitable requirement of 11 U.S.C. § 1129(b)(2)(A)(i). Section 1129(b)(2)(A)(i) requires "that the holders of such claims retain the liens securing such claims . . . to the extent of the allowed amount of such claims." 11 U.S.C. § 1129(B)(2)(A)(i). Cottonwood argues that JPI's lien position is not being changed by the Plan because at the time JPI extended the loan to Cottonwood, the disposition of the condemnation and insurance proceeds was controlled by the lease, and because the SNDA provisions contained in the Plan are the same as those contained in the SNDA between JPI and Circuit City that existed at the time of the original loan. This Court disagrees.

In *In re Ford Products Corp.,* 159 B.R. 693 (Bankr.S.D.N.Y. 1993), a case cited by JPI, the debtor's plan required secured claimants to execute subordination agreements in favor of the lease interests of prospective tenants. The *Ford Products* court held that such a provision violated the "fair and equitable" requirement of 11 U.S.C. § 1129(B)(2)(A)(i) that secured claimants retain their liens to the extent of the allowed amount of their claims, reasoning that because the creditor's lien primed the lease interests, a subordination of that lien would frustrate the creditors' ability to exercise a senior interest over the debtor's tenants. *Ford Products,* 159 B.R. at 695.

Cottonwood attempts to distinguish *Ford Products* on its facts, pointing out that the debtor in *Ford Products* had never before been involved in retail leasing, unlike the debtor in this case. Cottonwood reasons that the necessity of SNDAs was contemplated by both the Cottonwood and JPI at the inception of the loan, and that, because JPI's interests were already subordinated to the interests of the tenant under the SNDA with Circuit City, requiring JPI's interest be subordinated to the interests of new tenants does not impair their position.

In this Court's view these distinctions are unavailing with regard to the requirements of 11 U.S.C. § 1129(b)(2)(A)(i). SNDAs modify the rights of a lender. By including subordination and non-disturbance provisions applicable to the leases to Baillios and Panera in its Plan, Cottonwood is altering JPI's lien by modifying its lien rights as to new tenants, thereby not retaining JPI's existing lien. An SNDA customarily contains terms negotiated between the lender and tenant, or among the lender, tenant and borrower, in light of the particular tenant involved and based on facts and circumstances existing at the time of the negotiation. Under the Plan, SNDAs would be imposed on JPI, without its consent, and with respect to tenants other than Circuit City. This modifies JPI's lien, and therefore does not

-41-

satisfy the requirement of Section 1129(b)(2)(A)(i) "that the holders of such claims retain the liens securing such claims."

    2.  <u>The Plan does not satisfy the fair and equitable requirements of U.S.C. §§ 1129(b)(1) and 1129(b)(2)(A)(iii).</u>

Alternatively, Cottonwood asserts that it has satisfied the fair and equitable requirements under 11 U.S.C. § 1129(b)(2)(A)(iii). Section 1129(b)(2)(A)(iii) "allows a plan to alter the rights of the secured creditor if, and only if, the creditor will receive the 'indubitable equivalent' of its claim." *In re Investment Company of the Southwest, Inc.,* 341 B.R. 298, 318 (10th Cir. BAP 2006)(citation omitted). Congress derived the indubitable equivalent standard contained in Section 1129(b)(2)(A)(iii) from Judge Learned Hand's opinion in *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2nd Cir. 1935).[31] In *Murel Holding,* the Court reasoned that, in order to adequately protect the creditor, the creditor must be provided with "a substitute of the most indubitable equivalence." *Murel Holding,* 75 F.2d at 942.

Indubitable equivalence is a "flexible standard." *Philadelphia Newspapers,* 418 B.R. at 568. A creditor's proposed treatment is the indubitable equivalent when "there is no reasonable doubt" that the creditor will receive the full benefit of its bargain made at the inception of its contract with the debtor. *Investment Co. of Southwest,* 341 B.R. at 319. There are a variety of ways in which a debtor may satisfy the "indubitable equivalent" requirement with respect to the claim of a secured lender, such as by a cash payout, an exchange of

---

[31] *See In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460-61 (10th Cir 1985); *Investment Co. of the Southwest,* 341 B.R. at 319; *Philadelphia Newspapers,* 418 B.R. at 567 (noting that "[t]he indubitable equivalent concept contained in section 1129(b)(2)(A)(iii) was crafted and coined by Judge Learned Hand in *In re Murel Holding Corp.*").

collateral, or surrendering the collateral to the lender.[32]  Any substitute collateral must not increase the creditor's risk exposure.[33]

An analysis of the indubitable equivalent requirement overlaps with the general directive under 11 U.S.C. § 1129(b)(1) that a plan must be fair and equitable in order to effectuate cram down.  Therefore, to determine whether Cottonwood may effectuate a cram down that includes binding JPI to an SNDA, the Court will consider together not only the specific requirement of Section 1129(b)(2)(A)(iii) but also the more general fair and equitable requirements of Section 1129(b)(1).

JPI cites *In re 641 Associates, Ltd.,* 1993 WL 332646 (Bankr.E.D.Pa. Aug. 26, 1993) in support of its assertion that a plan may not bind a creditor to the terms of an SNDA.  In *641 Associates,* the bankruptcy court considered confirmation of a Chapter 11 debtor's plan which included a requirement that the lender grant a non-disturbance agreement in favor of a new tenant.  The Court denied confirmation, stating several times that it was unlikely to compel the lender to execute a non-disturbance agreement, and that requiring the lender to execute a non-disturbance agreement "is relief to be cautiously granted, if at all."  The long history of the case weighed against the debtor.  The Court had previously denied confirmation several times and had given the debtor a "blueprint" for confirmation.  In the Court's view, *641 Associates* does not foreclose the possibility that a debtor may achieve the equivalent of an SNDA through plan confirmation, *provided* the plan otherwise satisfies the fair and equitable requirements of both 11 U.S.C. § 1129(b)(1) and 11 U.S.C. § 1129(b)(2)(A)(iii). However, Cottonwood's current Plan falls short of this mark.

---

[32]*In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 311 (3rd Cir. 2010)(citing cases).
[33]*In re Arnold & Baker Farms,* 85 F.3d 1415, 1422 (9th Cir. 1996)(citations omitted); *Investment Co. of Southwest,* 341 B.R. at 319 (explaining that  "[w]hen a plan proposes to substitute or alter collateral, . . . a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk.")(citing *Arnold & Baker Farms,* 85 F.3d at 1422).

-43-

Cottonwood's Plan does not satisfy the fair and equitable requirements of 11 U.S.C. §§ 1129(b)(1) and 11 U.S.C. § 1129(b)(2)(A)(iii) for the following reasons. First, the Plan unduly shifts risks to JPI. Under the proposed Plan, Cottonwood benefits from the upside potential of the property and takes little risk, while JPI is exposed to the downside risk. When JPI made its loan, the loan proceeds included an extra $500,000 reserve for debt service and tenant improvements. The size of the reserve was motivated by the fact that the sole tenant, Circuit City, was in a turnaround mode. Cottonwood then increased the reserve to more than $750,000 from retained earnings.

Under the Plan, no reserve is required or contemplated even though there is no evidence of the creditworthiness of Cottonwood's proposed tenants. JPI's representative testified that he regards the new tenants, particularly Baillios, as a substantially greater credit risk than a well capitalized national tenant. Further, the uncontroverted testimony of JPI's representative is that the size and shape of Cottonwood's building is such that carving up the building for multi-tenant use, as Cottonwood proposes, increases the risk of re-letting the premises if a tenant defaults.

Mr. Gracey, JPI's expert, gave credible testimony that Cottonwood prudently should maintain a reserve for debt service, tenant improvements and other contingencies of at least $250,000, in addition to having immediate access to funds to cover projected cash shortfalls. And while the evidence presented at the final confirmation hearing suggests that Cottonwood's members apparently have the financial ability to provide funds for a reserve, there is no requirement in the Plan for them to do so. Only if JPI chooses the second option under the Plan and agrees to limit its claim to a certain amount will one of Cottonwood's

-44-

members capitalize or loan Cottonwood up to $1 million to accomplish a refinance within two years to payoff its debt to JPI.

In addition, during the first three years after the effective date of the Plan, the Plan, as Mr. Gracey testified, is "priced to perfection." Any material negative change in projected income or expense would render Cottonwood unable to meet its current obligations without financial assistance from its members. And for the next few years there is a relatively small projected cash cushion to cover any contingencies that may occur. Except for a $100,000 letter of credit to cover projected cash deficits, the Plan is designed to permit Cottonwood's members to decide when and whether to provide any necessary financial support for Cottonwood or take any other financial risk, or whether instead to surrender the property to JPI as its sole recourse upon default. Such an arrangement is not fair and equitable to JPI because it shifts too much of the risk to JPI, particularly in view of the financial strength of Cottonwood's members.

Further, if cash is accumulated, the Plan does not effectively restrict Cottonwood's members from causing Cottonwood to distribute the cash to themselves instead of leaving cash in Cottonwood as a reserve or credit enhancement for JPI. A more meaningful restriction on distribution of cash reserves than the one contained in the Plan would be reasonable, particularly in light of Cottonwood's previous distribution of the $525,000 reserve to its members after it defaulted in its obligations to JPI. Even though the members deposited the $525,000 in segregated accounts, and even though Cottonwood expects its members will use substantially all of those funds in connection with leasing commissions, tenant improvements, and other items associated with leasing the property to it two new tenants, in fact, none of its members have legally bound themselves to use the funds in any particular

manner. It is quite possible, for example, that the members may intend to keep the funds if a plan is not confirmed in this case.

Finally, Cottonwood has not sustained its burden of proof that the SNDA provisions in the Plan do not increase JPI's exposure to the risk of its claim not being paid in full. There is no reliable evidence that JPI is protected by a substantial security cushion in its collateral. Nor is there any reliable evidence that JPI otherwise is adequately protected from any risk resulting from converting the building built for single tenant into a multi-tenanted building. Without an appropriate reserve, if a tenant needed rent concessions in times of difficulty, there is no assurance that Cottonwood would be in a position to make any concessions to prevent a default. Further, if a tenant defaulted, there would be no funds available to find a new tenant or to make debt service. Cottonwood's own projections show no reasonable cash cushion for years after the effective date of the Plan.

For these reasons, the Court finds that Cottonwood's Plan fails to satisfy the fair and equitable requirements for cramdown under 11 U.S.C. § 1129(b)(1) and 11 U.S.C. § 1129(b)(2)(A)(iii). Cottonwood's proposed treatment of JPI's claim neither satisfies the more general fair and equitable requirement of 11 U.S.C. § 1129(b)(1) nor the fair and equitable requirement of 11 U.S.C. § 1129(b)(2)(A)(iii).

F. Cottonwood's Plan is Not Feasible

JPI asserts that the plan does not satisfy the feasibility requirement of 11 U.S.C. § 1129(a)(11). The Court agrees.

Section 1129(a)(11), requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . ., unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

-46-

This is known as the feasibility requirement for confirmation. The plan proponent, here, Cottonwood, bears the burden to show feasibility by a preponderance of the evidence.[34]

"'[I]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.'"[35] "Feasibility determinations must be 'firmly rooted in predictions based on objective fact.'"[36] "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"[37]

"When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations. The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic."[38]

Cottonwood's cash flow projections show ending cumulative cash at year-end in 2012, 2013 and 2014 of $790.00, $4,762.00 and $26,479.00, respectively, after infusion of $100,000 by its members to cover projected cash deficits. Cottonwood projects total revenue of more than $600,000 per year beginning in 2013, the first stabilized year under the plan. Cottonwood projects no reserves for tenant improvements, debt service or other contingencies.

---

[34] *Investment Company of the Southwest,* 341 B.R. at 310 ("Debtor bears the burden to show feasibility by a preponderance of the evidence.")(citing *In re Danny Thomas Props. II Ltd. P'ship,* 241 F.3d 959, 963 (8th Cir. 2001)).

[35] *Pikes Peak*, 779 F.2d at 1460 (*quoting In re Monnier Bros.,755 F.2d 1336, 1341* (8th Cir. 1985)(quoting *United Properties, Inc. v. Emporium Department Stores, Inc.*, 379 F.2d 55, 64 (8th Cir. 1967)(additional internal quotation marks omitted)).

[36] *Investment Company of the Southwest,*341 B.R. at 311 *(quoting Danny Thomas Props.,* 241 F.3d at 964)(quoting *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985)(additional internal quotation marks omitted)).

[37] *Pikes Peak,* 779 F.2d at 1460 (*quoting In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir. 1985)).

[38] *Investment Company of the Southwest,* 341 B.R. at 310 (citing *In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 482 (Bankr.E.D.Mich. 1995)).

-47-

Although Cottonwood's manager testified that he expects its members to provide Cottonwood with a $100,000 letter of credit to fund projected cash deficits, as of the confirmation hearing no letter of credit was issued, and Cottonwood had not obtained a commitment by its members to provide a letter of credit or a commitment by a lending institution to issue a letter of credit. Further, there is no evidence of the proposed terms of the letter of credit. It is unclear, for example, whether the letter of credit is revocable, or whether the members of Cottonwood could cause Cottonwood to not to draw on the letter of credit if they decided to surrender JPI's collateral in view of JPI having sole recourse against its collateral and Cottonwood. Additionally, Cottonwood's members have made no binding commitment to financially support Cottonwood beyond the $100,000 letter of credit. As JPI's expert Mr. Gracey testified, the plan in the early years is "priced to perfection." An expectation of perfection is unrealistic. The plan is not feasible.

CONCLUSION

For the foregoing reasons, JPI is entitled to interest on reimbursable expenses and attorneys' fees it incurred pursuant to the Note or Mortgage, and to post-petition interest at the default rate while this chapter 11 case is pending prior to the effective date of a plan. Because the class containing JPI's claim is impaired, Cottonwood must satisfy the requirements of 11 U.S.C. § 1129(b) with respect to that class. Under the Plan, as currently formulated, the cram down rate of interest is 7% per annum. Further, under the Plan as currently formulated, the Plan is not feasible. Nor has Cottonwood satisfied the fair and equitable requirements of 11 U.S.C. §§ 1129(b)(1) and 1129(b)(2)(A)(iii) under the Plan's current formulation.

The Court therefore denies confirmation of the Plan, without prejudice to Cottonwood filing a new plan or a further modification to the Plan. If a a further modification to the Plan

is filed to address the deficiencies in the Plan identified in this opinion that would have no material adverse impact on the treatment of any claims or equity holders that voted to accept the plan or that did not vote, the Court will not require further disclosure under 11 U.S.C. § 1125 or a further solicitation of votes under 11 U.S.C. § 1126 with respect to its consideration of the Plan, as so modified.[39]


_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  2/17/12


COPY TO:

**Daniel J Behles**
**George M. Moore**
Moore, Berkson & Gandarilla, P.C.
Attorneys for Debtor
P.O. Box 7459
Albuquerque, NM 87194

**Faye B. Feinstein**
**Lauren Nachinson**
Quarles & Brady LLP
Attorneys for Jefferson-Pilot Investments, Inc.
300 N LaSalle St, Suite 4000
Chicago, IL 60654

---

[39] *See In re Mirant Corp.*, 2005 WL 6443614, *5 (Bankr. N.D.Tex. 2005)(unreported)(plan modifications that will have no material adverse impact on the treatment of any claims do not require further disclosure under 11 U.S.C. § 1125 or a further solicitation of votes under 11 U.S.C. § 1126); *In re Trans World Airlines, Inc.*, 185 B.R. 302, 322 (Bankr. E.D.Mo.1995)(same); *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1023 (Bankr. D.Colo. 1988)("If the modification adversely affects the interests of a creditor who has previously accepted the plan, in more than a purely ministerial de minimis manner, that creditor should have the opportunity to reconsider and change his or her vote). *Cf. In re Western Asbestos Co.*, 313 B.R. 456, 472 (Bankr. N.D.Cal.2004), *order aff'd by* 2004 WL 1944792 (N.D.Cal. 2004)(no further disclosure or solicitation of votes was required because the changes to the plan were mere clarifications technical amendments resulting in no material adverse change in the treatment of any creditor or equity security holder who previously accepted the plan).

**William R Keleher**
Local Counsel for Jefferson-Pilot Investments, Inc.
PO Box 2168
Albuquerque, NM 87103-2168

**Alice Nystel Page**
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608